871 F.2d 1088
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Irving J. ROSENBAUM, Plaintiff-Appellee,
v.
DAVIS IRON WORKS, Defendant-Appellant.
 No. 88-1245.
 United States Court of Appeals, Sixth Circuit.
 April 19, 1989.
 
 Before MILBURN and BOGGS, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Appellant Davis Iron Works (Davis) appeals the decision of the district court granting summary judgment to plaintiff-appellee Irving J. Rosenbaum. Rosenbaum sued to recover, under the Employees Retirement Income Security Act (ERISA), 29 U.S.C. Sec. 1001 et seq., a pro rata share of the overfunding of Davis's defined benefit pension plan. The court below awarded Rosenbaum a pro rata share of $63,868, amounting to $43,832.07. Rosenbaum was also awarded attorney's fees, amounting to approximately $10,000. Except for the award of attorney's fees, we affirm the judgment entered by the district court.
 
 
 2
 * This dispute concerns two pension plans implemented by Davis. From the early 1960s until his resignation on June 8, 1984, Rosenbaum was the majority stockholder and president of Davis. In 1967, under the direction of Rosenbaum, Davis established a pension plan (Original Plan) to cover its eligible non-union employees. Under this plan, Davis agreed to purchase annuity contracts for the covered employees. These contracts would produce a defined monthly pension upon the employee's retirement. The plan stated that "All amounts contributed by the Employer to the Trustee shall represent irrevocable contributions of the Employer to this trust."
 
 
 3
 While the plan stated that Davis could amend the plan at any time, the plan also stated that "No amendment shall provide for the use of trust funds for any purpose other than for the benefit of the participants and their beneficiaries." It also stated that "No funds contributed to this trust nor assets of the trust shall ever revert to or be made available to the Employer." Finally, the plan provided that "Upon termination of the trust any assets of the trust, other than contracts issued on the lives of participants, shall be distributed among the then participants in proportion to the attained cash values upon contracts then outstanding on the lives of such participants."
 
 
 4
 In 1979, after the passage of ERISA, the Original Plan was reframed in its entirety in order to comply with that legislation. This Amended Plan was again established under the direction of Rosenbaum, and he became the plan's trustee. Subsection 22.2(E) of the plan provided that "In the event there are assets of the Trust Fund remaining after the allocation under Subsection 22.2(D), the remaining assets shall be returned to the Corporation."
 
 
 5
 On June 8, 1984, Rosenbaum retired from his position as president of the company and trustee of the plan. Davis and Rosenbaum signed a stock redemption agreement in which Davis purchased Rosenbaum's 75% share of the company's stock. On the date of the signing of this agreement, both sides executed a mutual release of claims concerning the agreement. Rosenbaum elected, as permitted under the plan, to have the cash equivalent of his accrued benefits in the Plan transferred to a separate account to be held by the Plan until he decided to withdraw them. The money in this account was to be invested as directed by Rosenbaum, and the proceeds of the investments were to go into the account.
 
 
 6
 On October 5, 1984, Davis terminated the plan. On March 24, 1985, before the Plan participants were paid, Davis notified Rosenbaum that the Plan had miscalculated his benefits and overpaid his account by $65,324. Davis insisted that Rosenbaum return the excess to the Plan. Rosenbaum disputed the amount of the overpayment. On November 1, 1985, Rosenbaum, Davis, and the Plan settled the dispute and signed an agreement defining the plaintiff's benefits (the "release"). In consideration for Davis's agreement to pay a compromise amount, Rosenbaum agreed to release his claims against Davis, specifically exempting a claim against Davis for an increased redemption price for his stock due to an overfunding of the plan. At this point, both parties knew there was some overfunding of the plan, but neither knew the extent of the overfunding.
 
 
 7
 On November 21, 1985, Davis received the first portion of the excess assets of the plan. On December 24, 1985, Davis received the balance of the assets pursuant to Subsection 22.2(E) of the Amended Plan. In July 1986, Rosenbaum filed a claim in state court alleging that his redeemed shares were undervalued to the extent of 75% of the reversion. This claim was the one specifically reserved in the release. In January 1987, however, Rosenbaum filed this action asking for a pro rata share of the reversion. (The state court agreed to dismiss the stock redemption claim without prejudice.) Both sides in this action filed motions for summary judgment. In September 1987, the court below granted summary judgment to the plaintiff on his claim and also dismissed counterclaims filed by the defendant.[1] Rosenbaum v. Davis Iron Works, 669 F.Supp. 813 (E.D.Mich.1987). This appeal followed.
 
 II
 
 8
 Davis first contends that Rosenbaum lacks standing to maintain this action because he had already received all his benefits from the Plan before the residual assets were discovered. Davis argues that the segregation of Rosenbaum's assets from the Plan into a separate account constituted a constructive receipt of the benefits, disqualifying Rosenbaum from maintaining this suit. In support of this doctrine of constructive receipt, Davis looks to Federal tax law on when benefits received pursuant to ERISA pension plans are taxable.
 
 
 9
 In order to maintain an action under ERISA, one must be a considered a participant under the plan. 29 U.S.C. Sec. 1002(7) defines a participant as "any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan...." A former employee whose accrued benefits under a plan have already been distributed in a lump sum is not "eligible to receive a benefit" and thus is not a participant under ERISA. Kuntz v. Reese, 785 F.2d 1410, 1411 (9th Cir.1986).
 
 
 10
 Davis argues that, at the time of the reversion, Rosenbaum had already retired and received his benefits. The fact that he chose to keep his benefits in a segregated account maintained by the trust does not affect the fact that he already received his benefits. The account, while maintained by the trust, was invested at the direction of Rosenbaum. In order to receive his money, he had only to ask that the distribution be made. This control shows, according to Davis, that he constructively received his benefits.
 
 
 11
 Davis claims that the treatment of these benefits under Federal tax law supports its constructive receipt theory. Prior to 1981, Sec. 402 of the Internal Revenue Code treated these benefits as being received for tax purposes. However, as Rosenbaum points out, this section was amended in 1981 to read that only benefits that are actually distributed are taxed. Davis claims that while the change in the law did allow the delay of taxation of benefits by pension recipients, this change did not mean that the recipient could delay the distribution of his benefits as long as he wants. The intention of the law was to allow recipients to tell the administrators of the pension plan when they wished their benefits distributed, and the benefits would be distributed at that later date. In the present case, Rosenbaum did not set any date that his assets were to be released; under the provisions of the plan, he could delay distribution as long as he wanted. Under this kind of scheme, Davis argues, Rosenbaum should be considered to have received his benefits.
 
 
 12
 Davis argues that if the law is not interpreted in this manner, a massive tax loophole will have been created that Congress did not intend to create. In any event, the issue here, Davis argues, is whether Rosenbaum should be accorded standing under ERISA to sue for a reversion of assets after he received all the benefits due him under the plan. Davis argues that it makes no sense to allow Rosenbaum standing in this case and not allow it to those people who received their benefits in a lump sum.
 
 
 13
 We are not persuaded. Even if Davis were correct as to the tax treatment of Rosenbaum's benefits, it would not be dispositive of the issue in this case. In any event, it is not at all clear that Davis is correct. The language of the statute seems to support Rosenbaum. Section 402(a)(1) of the IRS Code states, in pertinent part, that "the amount actually distributed to any distributee by an employees' trust ... shall be taxable to him, in the year in which so distributed." It is undisputed that Rosenbaum's benefits were not distributed to him until November 1985, well after the termination of the plan. Thus, one can argue that, using Davis's own analogy, Rosenbaum had not yet received his benefits and was a participant in the fund.
 
 
 14
 In addition, it is our view that the Kuntz rule disallowing suits by non-participants is inapplicable in this case. In Kuntz, the plaintiff, who had clearly received his benefits, sought damages for a breach of fiduciary duty under ERISA. He, therefore, was not seeking a benefit from a plan, as a participant would, but rather was seeking monetary damages. In the present case, however, Rosenbaum is seeking a benefit under the plan, not damages for a violation of a fiduciary duty. Even someone who has ostensibly received all his benefits should be able to sue in a case such as this because the suit is for benefits the claimant was allegedly entitled to under the plan. Any other ruling would allow plan administrators to take benefits from plan recipients and then become immune to suit by paying beneficiaries some of the benefits to which they were entitled, while falsely representing that the amount paid was the full amount of the benefits due.
 
 
 15
 This kind of analysis was approved in a recent decision by the Ninth Circuit, the court that decided Kuntz. In Amalgamated Clothing & Textile Workers Union et al. v. Murdock et al., 861 F.2d 1406 (9th Cir.1988), the court held that a plaintiff who had already received his benefits could maintain an equitable action for a breach of fiduciary duty. The court concluded: "A fiduciary should not be allowed to keep ill-gotten profits simply because plan participants and beneficiaries have been paid their actuarially vested plan benefits." Id. at 1418. This conclusion is also supported by the recent Supreme Court decision in Firestone Tire and Rubber Co. v. Bruch, 109 S.Ct. 948 (1989). In that case, the Court held that a plaintiff can be considered a participant under the act for purposes of maintaining an action against the plan administrator if he has a 'colorable claim' to benefits. Id. at 958. Thus, a plaintiff in this type of case should be treated as a participant if he has a colorable claim to benefits under the plan.[2] Rosenbaum clearly has such a claim. We therefore conclude that Rosenbaum should be treated as a participant and, hence, has standing to sue.
 
 III
 
 16
 Davis next argues that Rosenbaum is not eligible to receive benefits because he was not a participant as defined by the Original Plan at the time of the discovery of the residual assets. That plan required a participant to be a current employee. The Amended Plan, like ERISA, however, does not exclude a retired employee from being a participant.
 
 
 17
 Davis argues that if, as the district court held, the Amended Plan's provision that all residual assets go to Davis is inoperative, its definition of participant, at least as it pertains to the distribution of these assets, should be as well. Rosenbaum should not be able to enforce only those parts of each plan that suit his interest.
 
 
 18
 We reject this contention. The Original Plan allowed all amendments, except for changes to provisions concerning the distribution of surplus assets. The Amended Plan is thus perfectly valid; only the one amendment challenged is void. The rest of the plan, including the definition of participant, remains valid. Rosenbaum can maintain his suit.
 
 IV
 
 19
 Davis next argues that the November 1, 1985 release of claims signed by Rosenbaum barred his claim. Davis contends that this release was a general waiver of all of Rosenbaum's claims concerning the residual assets of the Plan, with the exception of an action seeking an increased return for his redeemed stock based on the increased value of the shares due to the residual assets. The language of the release on which Davis relies reads: "In consideration of the agreements and undertakings of Davis and the Trust herein contained, Rosenbaum ... hereby irrevocably and unconditionally releases, acquits, and discharges Davis, the Trust ... of and from any and all claims, actions, and causes of action, however and whenever arising, whether fixed, contingent, liquidated and/or unliquidated, which Rosenbaum ... now ha[s], ever had or may hereafter have against the Releases by virtue of Rosenbaum's relationship with the Trust in any and all capacities whatsoever at any time."
 
 
 20
 It would certainly appear, considering the language of the release, that Rosenbaum waived all claims, present and future, as to the trust. The court below, however, held that such a general waiver could not upheld. It first cited 29 U.S.C. Sec. 1110, which states in pertinent part: "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." The court held that this provision prevented it from enforcing any waiver as to future claims against the Plan.
 
 
 21
 Davis argues, however, that this section does not apply to voluntary releases. It cites two cases for support. The first case, Arnulfo P. Sulit, Inc., et al. v. Dean Witter Reynolds, Inc., 847 F.2d 475 (8th Cir.1988), concerned an agreement to take ERISA plan claims to arbitration. The court ruled that Sec. 1110 did not prevent this kind of agreement. Id. at 478. Davis also cites an unpublished opinion of this court, Miller et al. v. General Motors Corp., No. 87-1493, (6th Cir., April 27, 1988), in which the panel held that an agreement to waive all employee rights under an employment contract, including benefits, in exchange for the opportunity to purchase stock did not violate Sec. 1110.
 
 
 22
 These cases are inapposite. Sulit only concerned an agreement as to the forum in which claims should be adjudicated, not a release of the claims themselves. Miller concerned the waiver of rights under an employment contract, not the waiver of claims that the administrators of a plan violated their fiduciary duty to the plan. The present case, on the other hand, involves exactly the type of case Sec. 1110 was meant to apply to, a waiver of claims of breach of fiduciary duty. The prohibition should apply.
 
 
 23
 The district court also held that because the waiver applied to future claims, there was a failure of consideration. Davis argues that there was clear consideration for the waiver in that Davis agreed to settle the dispute over the alleged overpayment to Rosenbaum by splitting the difference between each side's demands. The general waiver was the price Davis received in exchange for compromising its demands. In addition, Davis contends that the cause of action in the present case already existed at the time at the release in so much as Rosenbaum knew that there was an overfunding of the plan of some amount. He also knew that Davis, under the provisions of the Plan, intended to keep the reversion. His knowledge of these facts led him to reserve the redeemed stock action in the release, an action that would mean nothing if there was no overfunding. It is clear, then, Davis argues, that Rosenbaum intended to give up any claim in the residual assets.
 
 
 24
 We conclude, however, that it is clear that the release only applied to the claim concerning the overpayment of funds to him, not any future claims as to residual assets. Michigan law holds that a release covers only claims intended by the parties to be released and has no greater effect. Auto-Owners Insurance Co. v. Higby, 226 N.W.2d 580, 582 (Mich.App.1975). Rosenbaum could not possibly have waived such a claim because at the time this court had not yet decided Bryant v. Int'l Fruit Products Comp., Inc., 793 F.2d 118 (6th Cir.1986), in which this court held for the first time that amendments like the one giving the residual assets to Davis were void. Up until this point, Rosenbaum had no cause to believe that the residual assets would not go to Davis under the Plan.
 
 
 25
 In addition, at the time of the release, Davis had not yet even calculated the amount of the residuals, much less taken possession of them. Thus, Rosenbaum could not have any cause of action at the time because up until the point at which Davis took the assets, Davis could have fulfilled its duty and returned the assets to the participants. It was not until December 24, 1985, when Davis paid itself the balance of the assets, that the cause of action accrued. Rosenbaum cannot be deemed to have waived this action on November 1. Finally, it should be pointed out that Rosenbaum would have been very foolish to waive a claim to over $50,000 for a settlement that netted him about $2,000. We hold that the release does not bar this claim.
 
 V
 
 26
 Davis next contends that the provision of the Amended Plan allowing a reversion of surplus assets to the company was valid. The district court held that, under the interpretive principles established in Bryant, the Original Plan prohibited such an amendment. It found such a prohibition in the provisions of the plan that stated: "No amendment shall provide for the use of trust funds for any purpose other than for the benefit of the participants and their beneficiaries" and that "No funds contributed to this trust nor assets of the trust shall ever revert to or be made available to the Employer." Davis argues that the plan reviewed in Bryant is distinguishable from the one at issue here and that the Original Plan allows the amendment authorizing a reversion.
 
 
 27
 Davis bases its argument concerning the correct interpretation of the Original Plan on the structure of that plan. Davis points to the provisions of the Original Plan that define a contribution under the Plan. Davis argues that participants in the plan are entitled only to the specific amount of benefits discussed in the plan. The company is bound under the provisions of the plan to contribute enough money to provide those benefits. These contributions constitute the trust fund and are the funds which cannot revert back to the employer. Contributions in excess of those needed to generate the required benefits, however, are not part of the plan, are not made for the benefit of the participants, and should be returned to the employer. Thus, the prohibition against the reversion of contributions did not apply to the surplus assets claimed by Davis.
 
 
 28
 Davis finds support for this view in In Re C.D. Moyer Company Trust Fund, 441 F.Supp. 1128 (E.D.Pa.1977), where the court held that where the original plan stated it was "impossible, if any alteration, amendment or revocation be made ... for any of the trust corpus or income to be diverted to or revert to either of the employers or to be used for any purpose other than the exclusive benefits of the participants," an amendment allowing surplus assets to revert to the employer was acceptable because such assets were not part of the trust funds to be paid to beneficiaries. Id. at 1131, 1132. Davis also cites Wilson v. Bluefield Supply Co., 819 F.2d 457 (4th Cir.1987). There the court held that a provision stating: "No part of the Fund ... shall be withdrawn, assigned, or otherwise transferred in whole or in part" did not prohibit an amendment allowing residual assets to be diverted to the company. Id. at 462, 465. The court reasoned that the "Fund" only included those monies that were to be paid as benefits, not surplus assets. Id. at 464. Davis contends that the plan here, as in Moyer and Wilson, prohibited only the transfer of funds that were to be paid out as benefits.
 
 
 29
 We conclude, however, as did the court below, that this case is controlled by Bryant. In that case, this court considered exactly the issue disputed here. The original plan in Bryant contained a provision reading: "In no event and under no circumstances shall any contributions to this Trust by the Employer, nor any of the Trust Estate or the income therefrom, revert to or be repaid to the Employer; and all amounts paid by the Employer to the Trustees shall be used and applied for the sole and exclusive benefit of the participants under this Trust." Bryant, 793 F.2d at 120. In a second amended plan, the plan was amended to allow the distribution of the surplus assets to the company.
 
 
 30
 The court found the amendment void, holding that "this pension plan assured the participating employees that, once contributed, no money paid into the fund could ever be reclaimed by the company.... Even if a surplus from actuarial error might properly be considered not to be a part of the trust estate, nevertheless, the surplus assets did originate as 'contributions' to the trust." Id. at 123. The court was also impressed by the fact that the provision stated that under no circumstances, presumably including a surplus, could money revert to the employer. The court distinguished Moyer by saying the provision there referred only to the trust funds used for payment, not to the total contributions. Wilson can be distinguished on the same basis, as indeed the Wilson court did, when it discussed Bryant.
 
 
 31
 The provisions at issue in this case are similar to those in Bryant. The Original Plan referred to contributions, not the trust fund, and it also stated that no such funds shall ever revert to the employer. Davis attempts to distinguish Bryant by stating that it is not clear that the plan there was designed as was the plan here to eliminate surplus funds. Davis also argues that the Bryant plan refers not only to contributions, but also to the trust income and estate, making it clearer than is the case here that no income can be diverted. These attempts to distinguish Bryant are unpersuasive. We conclude that, following Bryant, the amendment is void.
 
 VI
 
 32
 Davis also contends that Rosenbaum should be estopped from maintaining this claim because he should not be able to profit from his bad acts. Davis contends that if the Amended Plan's provisions are contrary to the law, Rosenbaum should not be able to profit from these errors because, as president and majority stockholder of Davis, he was responsible for that plan. Rosenbaum, Davis points out, stated in the stock redemption agreement signed when he resigned, that "the Company is not in default in any material respect under any contract to which it is a party." Rosenbaum, Davis contends, did not keep this promise.
 
 
 33
 Michigan law holds that estoppel arises where one by his acts, representations, or silence when he ought to speak, intentionally or through culpable negligence induces another to believe in the existence of certain facts and that person justifiably relies on the existence of the assumed facts to his detriment. Hastings Mutual Insurance Company v. Hartford Accident & Indemnity Company, 352 N.W.2d 292, 295 (Mich.App.1984). One must have actual or constructive knowledge of the real facts in order for estoppel to exist. Langschwager v. Pinney, 88 N.W.2d 276 (Mich.1958).
 
 
 34
 Davis contends that Rosenbaum negligently led Davis into amending the plan to its detriment. Davis relied on Rosenbaum's representations that the plan was valid in making contributions to the plan. Had Davis known that any surplus assets were to go to the employees and not the company, it might have been able to avoid making excess contributions. Rosenbaum, as an experienced businessman, must be deemed to have constructive knowledge of the law as it relates to his business. Davis concludes that Rosenbaum should not be able to profit from his questionable acts.
 
 
 35
 It is our view, however, that Rosenbaum was in no way negligent in making the plan. The amendment was made in 1979, several years before Bryant held that such amendments were void. Rosenbaum never meant to injure Davis and, in fact, Davis is not injured. It merely has to give up a windfall to its rightful owners. As to its argument that reliance on the plan's validity led to excess contributions, Davis has argued in this appeal that the plan was designed to limit excess contributions. It should not now be able to argue that in fact it was lulled into overfunding. Lastly, we note that the wrongful act here was not the amendment, but the reversion of the funds. If Davis had not chosen to take the funds, there would have been no violation of the law. Rosenbaum had every right to sue.
 
 VII
 
 36
 Finally, Davis contends that the lower court erred in awarding Rosenbaum fees and denying its motion for fees. The decision of the district court concerning the grant of fees in ERISA cases should not be disturbed unless there is an abuse of discretion. Operating Engineers Pension Trust v. Beck Engineering & Surveying Co., 746 F.2d 557, 569 (9th Cir.1984). The criteria that a court should apply in deciding whether to award fees are laid out in Central States Pension Fund v. 888 Corp., 813 F.2d 760, 767 (6th Cir.1987). They are: (1) the degree of the opposing party's culpability or bad faith; (2) the ability of the opposing party to satisfy an award of attorney's fees; (3) whether an award of fees against the opposing party would deter others from acting in similar circumstances; (4) whether the party requesting fees sought to benefit all participants and beneficiaries of a multiemployer plan or to resolve a significant legal question; and (5) the relative merits of the parties' positions.
 
 
 37
 The court below held that the grant of fees was warranted because, first, Davis acted in disregard of the law as set out in Bryant, even after Rosenbaum cited the case when requesting payment. The release, the court held, does not justify Davis's actions. Second, Davis clearly had the money to pay fees. Third, this award would deter future similar conduct. Fourth, this litigation has resolved key legal questions regarding the distribution of assets, and all the participants will be benefitted by the result. Finally, the court held that Rosenbaum's legal position is far more meritorious than Davis's.
 
 
 38
 Davis contends that the court abused its discretion by not considering, when deciding that Davis acted in bad faith, the confusing and unsettled state of the law concerning reversion issues. Davis can also not be accused of bad faith in relying on a general release of claims or in interpreting the agreement as excluding Rosenbaum as a participant. Also, Davis argues that Rosenbaum did not seek to resolve important questions; he merely wanted to receive a windfall. In short, the issues in this case are too complex and the questions too close for fees to be awarded.
 
 
 39
 Even taking into account the abuse of discretion standard, we agree with Davis that fees should not have been awarded in this case. The issues in this case are unsettled enough that neither party can be said either to be acting with bad faith or to have an obviously more meritorious position than the other. We thus REVERSE and VACATE the award of attorney's fees. On all other issues, the judgment of the court below is AFFIRMED.
 
 
 
 [1]
 The dismissal of the counterclaims has not been appealed
 
 
 [2]
 We note, as pointed out by the court below, that Davis itself considered Rosenbaum a participant in three corporate documents issued after the segregation of Rosenbaum's assets. Rosenbaum concedes that these documents do not estop Davis from maintaining he is not a participant, but they do at least rhetorically support his position